IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

**DIXIE-NET COMMUNICATIONS, INC.**                                    **APPELLANT**

**V.**                                                      **CASE NO. 3:10-CV-84**

**BELLSOUTH TELECOMMUNICATIONS, INC.**
**d/b/a AT&T MISSISSIPPI**

**AND**

**MISSISSIPPI PUBLIC SERVICE COMMISSION;**
**BRANDON PRESLEY, LEONARD BENTZ AND**
**LYNN POSEY, IN THEIR OFFICIAL CAPACITIES**
**AS COMMISSIONERS**                                                      **APPELLEES**

## MEMORANDUM OPINION

Dixie-Net Communications, Inc. and BellSouth Telecommunications d/b/a AT&T Mississippi interpret differently their 2007 interconnection agreement ("ICA") as it relates to the payment of intercarrier compensation. Basically, each party seeks to read the terms in a light most favorable to its own economic best interests.

The ICA provides that the parties will pay each other for all IntraLATA Toll Traffic that terminates on the other's network except for Local Traffic and ISP Bound Traffic. At issue is whether calls made under AT&T's Area Calling Plan ("ACP") and Area Plus services should be treated as local traffic. Dixie-Net filed a declaratory judgment action with the Mississippi Public Service Commission ("MPSC") to resolve the dispute. The MPSC determined that calls made by AT&T Mississippi customers under the ACP and Area Plus services are Local Traffic pursuant to the ICA and therefore, AT&T Mississippi is not required to pay intrastate switched access fees to Dixie-Net for these calls. Dixie-Net appealed the MPSC ruling to the Chancery

1

Court of Tippah County. Not anxious to try this matter in Dixie-Net's home court, AT&T Mississippi removed the case. Having read the briefs and having reviewed the exhibits and further having heard argument, the court now shingles off into this fog.

**Standard of Review**

In the Fifth Circuit, a district court reviews "*de novo* whether the interconnection agreements . . . meet the requirements of the [Telecommunications Act of 1996] Act," but must review "all other issues" decided by the state commission, including contract interpretations, "under the more deferential arbitrary-and-capricious standard." *Budget Prepay, Inc. v. AT&T Corp.,* 605 F.3d 273, 276 (5th Cir. 2010); See also *Southwestern Bell Tel. Co. v. Pub. Util. Comm'n of Texas*, 208 F.3d 475, 482, 485 (5th Cir. 2000) (upholding state commission interpretation of an ICA where the interpretation was not arbitrary and capricious). Accordingly, this court must defer to the MPSC's interpretation of the ICA unless that interpretation was arbitrary and capricious.

The arbitrary-and-capricious standard is "narrow and highly deferential." *Medina County Environmental Action Ass'n v. Surface Transp. Bd.***,** 602 F.3d 687, 699 (5th Cir. 2010). Under that standard, a court "must assure [itself] that the agency considered the relevant factors in making the decision, its action bears a rational relationship to the statute's purposes, and there is substantial evidence in the record to support it; but, [a court] cannot substitute [its] judgment for that of the agency." *Id.* And, "[w]hen an agency's particular technical expertise is involved," the court is at its "most deferential in reviewing the agency's findings." *Id.* Indeed, a court "will uphold an agency's actions if its reasons and policy choices satisfy minimum standards of rationality." *Id. See also Texas Office of Pub. Util. Counsel v. Fed. Commc'ns*

*Comm'n*, 265 F.3d 313, 325 (5th Cir. 2001) (court applying arbitrary-and-capricious standard is only "to review the agency action to determine whether the decision 'was based on a consideration of the relevant factors and whether there was a clear error of judgment.'"). *Id.* (citation omitted).

For the reasons set forth below, the court finds that the MPSC did not act arbitrarily and capriciously because a reasonable interpretation of the ICA is that calls made under AT&T Mississippi's extended calling plans are Local Traffic. The relevant factors, according to both Dixie-Net and AT&T Mississippi, were the governing provisions in the ICA and that AT&T Mississippi's previously tariffed extended local calling area services were deregulated, the applicable portions of the tariffs were withdrawn, and the services have since been provided pursuant to the Price List.

### The Telecommunications Act of 1996

The Telecommunications Act of 1996, which amended the Communications Act of 1934, introduced a competitive regime for local telecommunications services, which were previously provided primarily by a single company within each local service area. To that end, the 1996 Act requires incumbent local exchange carriers ("incumbent LECs" or "ILECs"), such as AT&T Mississippi, to enter into ICAs with competitive local exchange carriers ("CLECs"), such as Dixie-Net. An ICA, among other things, establishes the rates, terms and conditions by which an ILEC provides its competitor with interconnection to the incumbent's network, so that telecommunications traffic can flow between the carriers' networks. 47 U.S.C. § 251(c)(2). The 1996 Act also requires carriers whose networks are interconnected to make arrangements for the payment of "reciprocal compensation" (*id*. § 251(b)(5)) for the transport and termination of

3

telecommunications calls that originate on one carrier's network and terminate on the other's (*id*. § 252(d)(2)).

Under the 1996 Act, a CLEC and an ILEC may arrive at an ICA through negotiation alone, in which event they may agree on terms that are not consistent with the substantive requirements of Section 251 of the 1996 Act. *Id*. § 252(a)(1). If the parties are unable to arrive at a complete agreement through negotiation, either party may petition the state utility commission to arbitrate the parties' disagreements (*id*. § 252(b)(1)), in which event the state commission arbitrates and resolves the issues in accordance with the requirements of Section 251 (*id*. § 252(c)). Parties to an ICA, whether negotiated or arbitrated, submit the ICA to the state commission, which then approves or rejects the agreement. If either party is aggrieved by a determination that the state commission makes in arbitrating or approving or rejecting an ICA, it may challenge the state commission's determination in federal district court. *Id*. § 252(e)(6).

**The ICA between Dixie-Net and AT&T Mississippi**

The MPSC approved the ICA between AT&T Mississippi and Dixie-Net on June 6, 2007. Only a few provisions in the voluminous agreement are relevant here. Of primary importance are the provisions defining "Local Traffic" which provide that the parties will not compensate each other for the transport and termination of Local Traffic:

> Local Traffic is defined as any telephone call that originates in one exchange and terminates in either the same exchange, or other local calling area associated with the originating exchange as defined and specified in Section A3 of BellSouth's[1] General Subscriber Service Tariff. (Attachment 3 ("Att. 3"), section 8.1.1)
>
> Neither Party shall pay compensation to the other Party for . . . Call Transport and

---

[1] The ICA is in the form of a multi-state agreement, applicable in the nine states, including Mississippi, in which BellSouth provides telecommunications services as an ILEC. The ICA therefore refers to "BellSouth" rather than to "AT&T Mississippi."

> Termination of Local Traffic or ISP-Bound Traffic . . . . (Att. 3, section 8.1.3)[2]

One next learns that the parties will compensate each other for the transport and termination of IntraLATA Toll Traffic:

> IntraLATA Toll Traffic is defined as all traffic . . . that originates and terminates within a single LATA that is not Local Traffic or ISP-Bound Traffic. (Att. 3, section 8.1.6)

> For terminating its intraLATA toll traffic on the other Party's network, the originating Party will pay the terminating Party [the appropriate rate as specified in certain tariffs]. (Att. 3, section 8.1.6.1)

It is clear to this court that the parties agreed (1) to not pay each other for the transport and termination of "Local Traffic," as defined; (2) to pay each other specified rates for the transport and termination of "IntraLATA Toll traffic"; and (3) if a call is not "Local Traffic," it is "IntraLATA Toll Traffic." Consequently, whether the party originating a call must pay the other party for transporting and terminating the call on its network depends on whether the call is or is not "Local Traffic," *i.e.*, whether the call does or does not "originate[] in one exchange and terminate[] in either the same exchange, or other local calling area associated with the originating exchange as defined and specified in Section A3 of BellSouth's General Subscriber Service Tariff."

The ICA provision in dispute is section 30.2 of the General Terms and Conditions ("GTC § 30.2"), which provides in pertinent part:

> [I]n any state where certain BellSouth services or tariff provisions have been or become deregulated or detariffed, any reference in this Agreement to a detariffed or deregulated service or provision of such tariff shall be deemed to refer to the service description, price list or other agreement pursuant to which BellSouth provides such services as a result of detariffing or deregulation.

---

[2] ISP-Bound Traffic means traffic to an Internet Service Provider ("ISP"). The reference to ISP-Bound Traffic has no bearing on the parties' disagreement.

Dixie Net argued before the MPSC that phone calls originating and terminating in the same extended local calling area are not "Local Traffic" under the ICA and therefore AT&T Mississippi must compensate Dixie-Net for such traffic. Thus, the question before the MPSC was whether the reference in the definition of Local Traffic to "Section A3 of BellSouth's General Subscriber Service Tariff" was or was not a reference to a "detariffed or deregulated service or provision in [a] tariff" that must, under GTC § 30.2, be "deemed to refer to the service description, price list or other agreement pursuant to which BellSouth provides such services as a result of a detariffing or deregulation." The MPSC answered this question in the affirmative, and ruled that AT&T Mississippi was not obligated to compensate Dixie-Net for phone calls originating and terminating in an extended local calling area.

### AT&T Mississippi's Extended Local Area Calling Plans

At the MPSC, it was undisputed that until 2006, "Local Traffic," as defined in the ICA, encompassed calls made under AT&T Mississippi's extended local calling area plans, which were set forth in Section A3 of AT&T Mississippi's General Subscriber Service Tariff (the "Tariff"). One of these extended local calling plans was the ACP. Under the ACP, as the MPSC noted, subscribers received "local calling of station-to-station sent paid calls completed to their county seat and to wire centers within 55 miles of their originating wire center." Another extended local calling plan, Area Plus service, expanded ACP by providing that payment of the local phone rate entitled a residential subscriber to an unlimited number of calls within the extended local calling area. These plans treated calls which would otherwise be intraLATA Toll traffic, and thus subject to intercarrier compensation, as "Local Traffic," which is not subject to intercarrier compensation. Since the plans were listed in Section A3 of the Tariff, the traffic they

6

covered was within the definition of Local Traffic in the ICA.

In 2006, however, the Mississippi Legislature deregulated most retail telecommunications services offered by AT&T Mississippi, including optional local area calling plans such as ACP and Area Plus service. Accordingly, AT&T Mississippi removed those services from Section A3 of the Tariff and placed them on its Price List.

The MPSC found the relevant terms of the ICA unambiguous and ruled in favor of AT&T Mississippi, holding that ACP and Area Plus Service calls are Local Traffic under the ICA. Dixie-Net contends that the MPSC's Order was largely a political, rather than legal, decision. This contention is based on the fact that before the MPSC Commissioners went into executive session to discuss the matter, a member of a separate agency, the Mississippi Public Utilities Staff (not one of the three Commissioners of the MPSC), stated that the discussion would focus on interpretation of the ICA, the historical utilization of area calling plans in Mississippi, and the potential impact on Mississippi telecommunications users of a change in compensation treatment relating to local calling plans. In Dixie-Net's view, the MPSC could properly consider only the interpretation of the ICA, and any consideration of historical utilization or impact on consumers was inappropriate and political. Agencies and commissions act only through their minutes and orders of record. *See, Ex parte Williams,* 277 U.S. 267, 272, 48 S.Ct. 523, 525 (1928). The record does not hint of the executive session discussion and this court is not anxious to base its decision on a guess as to whether elected commissioners based their decisions on political considerations.

Dixie-Net argues that GTC § 30.2 comes into play only when the deregulation occurs during the term of the ICA, and that the provision does not apply here because AT&T

Mississippi's extended local calling area plans were deregulated in 2006, the year before the parties entered the ICA. GTC § 30.2 states that "where services *have been* or become deregulated, tariff references shall be deemed to refer to the service agreement, price list or other agreement pursuant to which services were provided" (emphasis added). Considering this language, it was reasonable for the MPSC to conclude that GTC § 30.2 applies when services are detariffed or deregulated before the contract term began ("have been deregulated") or during the contract term ("become deregulated"). The MPSC rejected Dixie-Net's interpretation because it would render the words "have been" in GTC § 30.2 meaningless.

Dixie-Net asserts that its reading is more just and reasonable than AT&T Mississippi's, and that its interpretation must be correct because when the MPSC approved the ICA, it was required to be sure that the ICA was just and reasonable to both carriers. This argument would be pertinent, if at all, only if the ICA were ambiguous. The MPSC found the ICA unambiguous, and this court agrees. Dixie-Net's remaining arguments about the MPSC's reading of the ICA require little discussion, because, like the fairness argument, they would come into play only if the ICA were ambiguous, which the MPSC found it was not – a determination that was not arbitrary and capricious.

Dixie-Net next argues that Local Traffic cannot reasonably include calls made pursuant to extended local calling area plans because Dixie-Net has no way of knowing which of AT&T Mississippi's customers participate in area calling plans, and therefore has no way to bill AT&T Mississippi using its own billing data. However, there is no support in the record for Dixie-Net's assertion that the parties have no way to bill each other using their own data under the MPSC's reading.

Finally, Dixie-Net contends that even if the MPSC's reading of the ICA was correct, so that the Price List must be consulted to determine which calls are Local Traffic, the disputed calls still do not qualify as Local Traffic, because the Price List does not mention "Local Traffic" and the extended calling area plans in the Price List merely offer customers an option to cap the amount they will pay for certain calls. The court cannot properly entertain this argument because Dixie-Net did not raise it at the MPSC. Failing to raise an issue at the administrative level waives the right to appellate review of the issue. *Southwestern Bell Tel. Co.*, 208 F.3d 475, 487 (citation omitted). Dixie-Net's new argument does not challenge the MPSC's reading of the ICA, but instead asks the court to interpret language in the Price List that the MPSC was not asked to interpret.

Based on the foregoing analysis, the court concludes that the MPSC's ruling was not arbitrary and capricious and should therefore be affirmed.

This the 11th day of April, 2012.

                                                **/s/ MICHAEL P. MILLS**
                                                **CHIEF JUDGE**
                                                **UNITED STATES DISTRICT COURT**
                                                **NORTHERN DISTRICT OF MISSISSIPPI**